David M. MUMFORD, Plaintiff–
Appellant,

v.

David A. BASINSKI, Defendant–Appellee.

No. 95–4127.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 1, 1996.

Decided Jan. 23, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied March 7, 1997.

Dennis J. Niermann (argued and briefed), Kramer & Niermann, Cleveland, OH, for plaintiff–appellant.

M. Robert Flanagan (argued and briefed), Office of Prosecuting Attorney, Elyria, OH, Richard Osborn Wuerth (briefed), Lane, Alton & Horst, Columbus, OH, for defendants–appellees.

Before: KRUPANSKY, BOGGS, and SILER, Circuit Judges.

KRUPANSKY, Circuit Judge.

The plaintiff-appellant, David M. Mumford ("Mumford"), has contested the district court's dismissal, as moot, of his 42 U.S.C. § 1983 claim against Judge David A. Basinski ("Basinski"), the successor in office of Mumford's former employer, former Judge Joseph C. Zieba ("Zieba"), who during his judicial tenure was the Administrative Judge of the Lorain County Common Pleas Court Domestic Relations Division ("the Domestic Relations Court"). The complaint had sought equitable relief for the political termination by Zieba of Mumford's at-will employment as the chief referee of the Domestic Relations Court in alleged violation of his First Amendment rights. On September 28, 1995, the trial court ruled that Mumford's claims against Basinski, as successor in office to Zieba, became moot upon the expiration of Zieba's term as a judge of the Domestic Relations Court which had resulted in Zieba's dismissal as a party defendant, and that Lorain County, Ohio, the identified interested public entity, had been previously dismissed as a defendant by virtue of the Sixth Circuit's dismissal, in *Mumford v. Zieba*, 4 F.3d 429, 435 (6th Cir.1993), of the Domestic Relations Court as a party defendant. *Mumford v. Zieba*, 915 F.Supp. 917 (N.D.Ohio 1995).

Mumford, a registered member of the Democratic Party, served as a referee of the Domestic Relations Court from 1984 until January 2, 1989. In 1988, Mumford aided a Democratic incumbent judge of the Domestic Relations Court, Henry T. Webber, in his reelection bid against his Republican challenger, Joseph Zieba. Zieba prevailed in the November 1988 election. During the campaign, Zieba had expressly advised Mumford, "don't get caught in the cross-fire." On December 22, 1988, Zieba, as judge-elect of the Domestic Relations Court who would serve as the Administrative Judge of that court, informed Mumford by letter that his employment with the Domestic Relations Court would terminate immediately upon Zieba's assuming office on January 3, 1989.[1] *Mumford*, 4 F.3d at 430.

On December 17, 1990, the plaintiff initiated this action against the Domestic Relations Court, and Zieba in both his personal and official capacities, under 42 U.S.C. § 1983, alleging that he had been terminated because of his political affiliation, which purportedly deprived him of his First Amendment rights. The plaintiff sought damages, declaratory relief, and an injunction compelling his reinstatement with back pay and benefits plus interest. On March 31, 1992, the district court, in deciding cross motions for summary judgment, *inter alia* denied Zieba's summary judgment motion anchored in qualified immunity. *Mumford v. Zieba*, 788 F.Supp. 987, 991–92 (N.D.Ohio 1992), *rev'd*, 4 F.3d 429 (6th Cir.1993). On September 1, 1993, this court reversed the rejection of Zieba's qualified immunity defense, ruling that the law was not clearly established in January 1989 that a state court judge could not refuse to retain an at-will court referee for political reasons. *Mumford v. Zieba*, 4 F.3d 429, 433 (6th Cir.1993). In addition to dismissing Mumford's claims against Zieba in his individual capacity, this reviewing court also dismissed the Domestic Relations Court as a party defendant because a section 1983 claim is not cognizable against a state court. *Id.* at 435 (*citing Foster v. Walsh*, 864 F.2d 416, 418 (6th Cir.1988) (per curiam)). This court remanded the cause to the trial court for adjudication of the remaining claims, to wit, Mumford's claims for equitable relief asserted against Zieba in his official capacity. *Mumford*, 4 F.3d at 435.

On January 2, 1995, Zieba's six-year term of office on the Domestic Relations Court expired. On February 13, 1995, the district

---

1. Ohio court referees serve at the pleasure of the appointing court. *Mumford*, 4 F.3d at 430 n. 1.

court substituted Basinski, the successor Administrative Judge of the Domestic Relations Court, in his official capacity as the named successor defendant herein. On September 8, 1995, Basinski moved for dismissal of the action as moot, urging that he had no part in Zieba's decision to discharge Mumford, and that no compelling evidence reflected that he (Basinski) intended to terminate court employees for political reasons in the future, and therefore (according to defendant Basinski) no relief could be imposed against him to correct wrongs committed by a predecessor in office. On September 28, 1995, the district court dismissed Mumford's action as moot, ruling that no relief remained available against either Basinski in his official capacity as the successor in office to Zieba, or Lorain County, Ohio as the public entity purportedly in interest. *Mumford v. Zieba*, 915 F.Supp. 917 (N.D.Ohio 1995).

A state court is not a "person" for purposes of 42 U.S.C. § 1983 and hence is not subject to lawsuit under that statute.[2] *Mumford*, 4 F.3d at 435 (*citing Foster v. Walsh*, 864 F.2d 416, 418 (6th Cir.1988) (per curiam)). "Persons" exposed to legal liability under section 1983 include municipal corporations and other "bodies politic and corporate." *Foster*, 864 F.2d at 418 (*citing Monell v. Department of Social Services*, 436 U.S. 658, 688, 98 S.Ct. 2018, 2034–35, 56 L.Ed.2d 611 (1978)). Under Ohio law, a *county* "is a body politic and corporate" which "is capable of suing and being sued . . . ." Ohio Rev. Code Ann. § 301.22 (Anderson 1992). By contrast, the United States Supreme Court has dictated that, unlike counties and municipalities, *state* governments, and their arms, officers, and instrumentalities, are generally immune from private lawsuit in federal court by virtue of the Eleventh Amendment to the United States Constitution.[3] *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977); *Moor v. Alameda*, 411 U.S. 693, 717–21, 93 S.Ct. 1785, 1799–1802, 36 L.Ed.2d 596 (1973); *accord Hutsell v. Sayre*, 5 F.3d 996, 998–99 (6th Cir.1993), *cert. denied*, 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994); *Hall v. Medical College of Ohio*, 742 F.2d 299, 301

**2.** Section 1983 provides, in pertinent segment:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

(Emphasis added).

**3.** The Eleventh Amendment dictates:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

This constitutional mandate has long been liberally construed by the Supreme Court to extend state immunity to federal suit to reach actions potentially initiated by any person against an unconsenting state, including causes inaugurated by a citizen or citizens of the subject state itself, as well as certain other classes of litigation. *E.g., Seminole Tribe of Florida v. Florida*, — U.S. —, ——, 116 S.Ct. 1114, 1122–23, 134 L.Ed.2d 252 (1996); *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974); *see generally Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135, 1138 (8th Cir.1974) (citing multiple Supreme Court decisions).

Under certain limited circumstances, Congress, when acting under a proper constitutional grant of authority, may expressly abrogate the states' Eleventh Amendment immunity respecting enforcement of a particular statute. *See Seminole Tribe*, — U.S. at —— ——, 116 S.Ct. at 1123–32; *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985); *Wilson–Jones v. Caviness*, 99 F.3d 203, 208 (6th Cir.1996). However, Congress did not abrogate the states' Eleventh Amendment immunity from legal actions in federal court by enacting section 1983. *Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979); *In re Secretary of Dept. of Crime Control*, 7 F.3d 1140, 1149 (4th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 2106, 128 L.Ed.2d 667 (1994); *Williams v. Missouri*, 973 F.2d 599, 600 (8th Cir.1992) (per curiam).

Additionally, a state may waive its Eleventh Amendment immunity, usually via legislative enactment. *Wilson–Jones*, 99 F.3d at 206 n. 1. Ohio has statutorily waived its state sovereign immunity against certain *state court* actions by consenting to exposure to private litigations in the Ohio Court of Claims, subject to certain limitations and conditions. *See* Ohio Rev.Code Ann. § 2743.02 (Anderson Supp.1995). This limited legislative renunciation of governmental immunity has no application to the instant action.

(6th Cir.1984), *cert. denied,* 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985).

◼ The central inquiry confronting this appellate review is whether the Domestic Relations Court is a state of Ohio entity, or instead is an appendage of the Lorain County government, for section 1983 purposes. If the Domestic Relations Court is deemed a part of the state government, Eleventh Amendment immunity will shield it, and its officers in their official capacities, from section 1983 legal actions in federal court; if it is construed as an extension of the county government, the section 1983 claims against the office of Administrative Judge of that court may proceed as, in effect, an action against Lorain County. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985).

In *Foster v. Walsh,* 864 F.2d 416 (6th Cir.1988) (per curiam), this circuit mandated that an Ohio municipal court was *not* an arm of the municipality which it served, concluding that the court was a component of the state government and hence was insulated from private federal court litigation by the Eleventh Amendment:

It cannot seriously be argued that an Ohio municipal court is indistinguishable from the municipal corporation in which it sits. The Akron Municipal Court is part of the Ohio state court system, established by the Ohio state legislature. Ohio Rev.Code § 1901.01. It is subject to the supervision of the Ohio Supreme Court. Ohio Const., Art. IV, § 5. The municipal court may not be abolished by the city council, nor may the council expand or restrict the court's jurisdiction. See *State ex rel. Cherrington v. Hutsinpiller,* 112 Ohio St. 468, 147 N.E. 647 (1925). The territorial jurisdiction of the Akron Municipal Court is not coextensive with the city limits of Akron. Ohio Rev.Code § 1901.02(B). The employees of the Akron Municipal Court are not city employees subject to the authority of the Akron Civil Service Commission. *Dugan v. Civil Service Commission of Akron,*

9 Ohio App.3d 218, 459 N.E.2d 618 (1983). *Foster,* 864 F.2d at 418–19.

*Foster* is existing precedent in this circuit and applies in the instant case. The Ohio Constitution commands that within the judicial system of that state:

There shall be a court of common pleas and such divisions thereof as may be established by law serving each county of the state. Any judge of a court of common pleas or a division thereof may temporarily hold court in any county. In the interests of the fair, impartial, speedy, and sure administration of justice, each county shall have one or more resident judges, or two or more counties may be combined into districts having one or more judges resident in the district and serving the common pleas courts of all counties in the district, as may be provided by law.[4] Judges serving a district shall sit in each county in the district as the business of the court requires. In counties or districts having more than one judge of the court of common pleas, the judges shall select one of their number to act as presiding judge, to serve at their pleasure. If the judges are unable because of equal division of the vote to make such selection, the judge having the longest total service on the court of common pleas shall serve as presiding judge until selection is made by vote. The presiding judge shall have such duties and exercise such powers as are prescribed by rule of the supreme court.

Ohio Const. art. IV, § 4(A).

Additionally, the fundamental law of Ohio imparts supervisory authority over all courts of that state, and the authority to promulgate rules for all courts of that state, to the Ohio Supreme Court. Ohio Const. art. IV, § 5. The state constitution also dictates standards controlling the election, residency, tenure, compensation, and eligibility of every Ohio common pleas judge. Ohio Const. art. IV, § 6.

Like all Ohio common pleas court judgeships, the six extant Lorain County Common

---

**4.** Ohio statutory law commands that each county shall have its own common pleas court, with one or more judges sitting in a particular county as designated by state law. Those judges must satisfy state imposed residency and law practice requirements, and shall be elected for the standard, state-created six-year term. Ohio Rev. Code Ann. § 2301.01 (Anderson Supp.1995).

Pleas Court judgeships were created by state statute, each having a six-year term commencing upon a statutorily fixed date. Ohio Rev.Code Ann. §§ 2301.01 (Anderson Supp. 1995) and 2301.02(B) (Anderson 1996 Bulletin # 5). Moreover, an Ohio statute decrees that a specific pair of the six common pleas judgeships in Lorain County shall constitute the domestic relations division for that county. Ohio Rev.Code Ann. § 2301.03(C) (Anderson 1996 Bulletin # 5).

Similarly, state statutes delineate the jurisdiction of the common pleas court. Ohio Rev.Code Ann. § 2305.01 *et seq.* (Anderson 1995 & Supp.1995). Moreover, the authority to hire personnel, including referees, for the domestic relations courts is delegated by state statute to the courts themselves rather than to county administrations; such employees of the domestic relations courts are compensated from special court funds rather than from county treasury general revenues.[5] The Ohio Constitution directs that an unexpected vacancy in any state judicial position shall be temporarily filled by an appointee of the governor until a qualified successor is elected. Ohio Const. art. IV, § 13; *accord,* Ohio Rev.Code Ann. § 107.08 (Anderson 1994).[6]

Furthermore, the Ohio legislature has compelled the county governments to provide support for the operation of the common pleas courts within their borders. For example, each board of county commissioners must provide a location for conducting sessions of court, Ohio Rev.Code Ann. § 305.22 (Anderson 1992), and must erect and sustain a courthouse where needed, Ohio Rev.Code Ann. § 307.01(A) (Anderson 1992). A state statute empowers the common pleas court to submit to the local board of county commissioners an annual written request for administrative expense funds which the court deems reasonably necessary; if, after conducting a public hearing on the court's funding request, the amount allocated by the county to the common pleas court is deemed insufficient by that court, the common pleas court may petition the state court of appeals, via a petition for a writ of mandamus under Ohio Revised Code Chapter 2731, for a judicial determination of the duty of the board of county commissioners to appropriate the additional funds in dispute. Ohio Rev.Code Ann. § 307.01(B) (Anderson 1992); *see also State ex rel. Morley v. Lordi,* 72 Ohio St.3d 510, 511–12, 651 N.E.2d 937, 939 (1995) (a juvenile court, as a division of an Ohio common pleas court, may seek a writ of mandamus in the Ohio Supreme Court to compel a county board of commissioners to appropriate funds necessary for the reasonable expenses of the court).

▪ Consequently, an Ohio common pleas court is *not* a segment of county government, but an arm of the state for purposes of section 1983 liability and Eleventh Amendment immunity analyses.[7] Therefore, the in-

---

5. Under Ohio Rev.Code Ann. § 2301.03(C) (Anderson 1996 Bulletin # 5), the judges of the Lorain County Domestic Relations Court exercise the powers of a juvenile court judge. Ohio Rev. Code Ann. § 2151.13 (Anderson 1994) empowers juvenile court judges in Ohio to appoint such "employees as are necessary and may designate their titles and fix their duties, compensation, and expense allowances." Such employees serve at the pleasure of the judge, and are compensated from the fund appropriated by the county for the operation of the court. *Id.; see also* Ohio Rules of Civil Procedure 53 (Anderson Supp. 1995) and 75(C) (Anderson 1994).

6. *Cf.* Ohio Rev.Code Ann. § 305.02 (Anderson 1992) (governing appointments to fill vacancies in the offices of county commissioner, county prosecutor, county auditor, county treasurer, clerk of the common pleas court, county sheriff, county recorder, county engineer, or county coroner). The statute does not provide for a gubernatorial appointment to fill any vacancy in any of these offices under any circumstances. Rather, such a vacancy shall be temporarily filled by an appointee selected at the county level.

7. In so ruling, this court is cognizant of two Ohio appellate decisions from Franklin County which have mandated that, *for purposes of the state's statutory relinquishment of sovereign immunity and consent to be hailed into the Ohio Court of Claims under Ohio Rev.Code § 2743.02,* a court of common pleas shall *not* be deemed a part of the state government, and hence is not exposed to legal action in the state court of claims. *Dalton v. Bureau of Criminal Identification & Investigation,* 39 Ohio App.3d 123, 530 N.E.2d 35 (1987); *Tymcio v. State,* 52 Ohio App.2d 298, 369 N.E.2d 1063 (1977). These rulings were anchored in the applicable statutory definition of "state" contained in Chapter 2743 ("Court of Claims") of the Ohio Revised Code, which expressly excludes "political subdivisions" of the state. Ohio Rev.

stant claim against Basinski in his official capacity as the successor in office to Zieba as the Administrative Judge of the Domestic Relations Court cannot stand. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985).[8] The state of Ohio is insulated from litigation exposure in federal court by the Eleventh Amendment to the United States Constitution.[9]

In the alternative, the case sub judice was properly dismissed because Mum-

ford's former position was, as a matter of law, not protected by the First Amendment. In *Mumford v. Zieba,* 4 F.3d 429 (6th Cir. 1993), this circuit recognized the Supreme Court's dictate that, in many circumstances, a public employee may not be dismissed because of his political beliefs or activities;[10] but a public employer may consider the political affiliation of a current or prospective employee "if political affiliation was an appropriate requirement for the effective perfor-

---

Code Ann. § 2743.01(A) & (B) (Anderson 1992). A "political subdivision" is statutorily defined to include "municipal corporations, townships, counties, school districts, and all other bodies corporate and politic responsible for governmental activities only in geographical areas smaller than that of the state to which the sovereign immunity of the state attaches." Ohio Rev.Code Ann. § 2743.01(B) (Anderson 1992). Stated differently, the "political subdivisions" of the state, as defined by section 2743.01(B), are those nonfederal public entities which are functionally restricted geographically to areas smaller than the entire state, which units are at least partially independent of the state government, such as counties and cities. *See Mt. Healthy,* 429 U.S. at 280–81, 97 S.Ct. at 572–73. The Ohio appellate tribunals in *Dalton* and *Tymcio* resolved that a common pleas court, although not a "political subdivision" in the ordinary meaning or in the strict sense of the statutory definition of that term, is sufficiently independent and distinct from the central state government to categorize it as a type of "political subdivision" of the state, shielding it from private suits in the state court of claims. However, nothing in either opinion mandates that a common pleas court should be construed as a component of *county* government for *any* purpose. To the contrary, those courts intimated that, in the broader sense, the common pleas courts remain instrumentalities of *state* government. *Dalton,* 530 N.E.2d at 36; *Tymcio,* 369 N.E.2d at 1065. While this court expresses no view regarding the correctness of the lower appellate court rulings in *Dalton* and *Tymcio* as a matter of Ohio law, those decisions do not contradict, and indeed generally support, this court's ruling. *Accord, Dugan v. Civil Service Com'n of Akron,* 9 Ohio App.3d 218, 459 N.E.2d 618 (1983) (an Ohio court is a creature of state constitutional and statutory law and is administered by state authorities; the state legislature has the authority to control the conditions of appointment, status, tenure, and discharge of court employees).

8. In *Graham,* the Supreme Court pronounced: Official-capacity suits ... "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018,

2035, n. 55, 56 L.Ed.2d 611 (1978). *As long as the government entity receives notice and an opportunity to.respond,* an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.
*Kentucky v. Graham,* 473 U.S. at 165–66, 105 S.Ct. at 3105 (emphasis added) (citation omitted).
Therefore, the instant official capacity litigation is independently fatally defective because the state of Ohio had not been afforded timely notice and an opportunity to respond to the complaint.
It should also be noted that Mumford's cause against the named Administrative Judge in his official capacity as a state officer cannot be salvaged by invocation of the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Ex parte Young,* the Court mandated that, at least in some cases, a claim solely for prospective injunctive relief restraining a state official from continuing an ongoing violation of federal law may not be barred from federal court by the Eleventh Amendment. *See Seminole Tribe of Florida v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1132, 134 L.Ed.2d 252 (1996); *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985). However, cases against a state officer in which a claim for retrospective relief for *past* violation(s) of federal law is joined, such as the action at issue, are not exempted from the Eleventh Amendment's jurisdictional bar. *Green,* 474 U.S. at 68, 106 S.Ct. at 425–26.

9. The lower court erroneously concluded that the "true remaining defendant" following the dismissal of Zieba in his official capacity was Lorain County. *Mumford v. Zieba,* 915 F.Supp. 917, 918 (N.D.Ohio 1995). If the claim against Zieba in his official capacity had indeed constituted a cause against *Lorain County,* the mere dismissal of the Domestic Relations Division as an improperly named party defendant would not have vitiated a claim against the county under section 1983.

10. *See, e.g., Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (resolving that low-level public employees are constitutionally protected from adverse employment consequences engendered by their political affiliation).

mance of the public office involved." *Id.* at 433 (*citing Branti v. Finkel,* 445 U.S. 507, 515, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 372–75, 96 S.Ct. 2673, 2689–91, 49 L.Ed.2d 547 (1976)). Where a public occupation entails policymaking authority or a relationship of confidence with the employee's supervisor, the political beliefs and associations of a present or potential occupant of that position may appropriately be considered by the authority charged with making the employment decision. *Id.* at 433–34. Moreover, certain non-policymaking and non-confidential offices may also properly be deemed "political," and hence not protected by the First Amendment from patronage factors:

> ["]Under some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294. Thus, the Court abandoned the labels of "policymaker" and "confidential employee," and stated that the relevant issue was "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." [11]

*Mumford,* 4 F.3d at 434. *See also McCloud v. Testa,* 97 F.3d 1536, 1553 (6th Cir.1996).

The effective performance of a subordinate "political" public office requires that the employee and supervisor maintain a viable working relationship, which includes confidence by the supervisor in the employee's political credentials and philosophy, as well as his intellectual and technical abilities. In the instant case, candidate Zieba had promised, if elected, to "clean house" at the Domestic Relations Court by eliminating Webber's supporters from the court staff. As Zieba in essence campaigned against Webber

*and* his appointees and supporters on the court staff (including Mumford, an active Webber supporter), Zieba could not expect to have a viable working relationship with, or much confidence in the political loyalty of, that court staff. Rather, friction and animosity were probable expectations, which would undermine any close working relationship between Zieba and the incumbent chief referee.[12]

█ In *Mumford v. Zieba,* 4 F.3d 429, 433 (6th Cir.1993), this court lacked the occasion to directly address Mumford's former position as political versus non-political, but clearly *implied* that a court referee, of necessity, had a confidential relationship with the judge whom he served, which transformed political affiliation into an appropriate employment consideration.[13] *See id.* at 435. Generally, a government position is "political" if the office *either* (1) is inherently political because of its *general* duties, *or* (2) is effectively political because the *specific* duties assigned to a particular occupant of that office are of a political character. *Id.* at 432 n. 8 (*citing Faughender v. North Olmsted, Ohio,* 927 F.2d 909, 913–14 (6th Cir. 1991)).

█ Although the inherent duties of a state public officer are generally delineated by state law, the unique duties of a particular office holder are typically fact driven. However, the characterization of the position's general *or* specific duties as nonpolitical or political is a question of law. *See McCloud v. Testa,* 97 F.3d 1536, 1546 (6th Cir.1996); *Blair v. Meade,* 76 F.3d 97, 100 & n. 2 (6th Cir.1996). Accordingly, if, as a matter of law, the inherent duties of a referee in the service of an Ohio Domestic Relations Court are political in character, patronage considerations may justifiably influence or control the court's appointment to that post, and any

---

**11.** The Supreme Court recently reaffirmed this principle, and the *Elrod/Branti* analysis generally, in *O'Hare Truck Serv. v. Northlake,* —— U.S. ——, —— & ——, 116 S.Ct. 2353, 2355 & 2357, 135 L.Ed.2d 874 (1996).

**12.** *See Mumford,* 4 F.3d at 434. Beyond party membership, "political affiliation" can signify "commonality of political purpose and support[.]" *Id.* at 433 n. 9 (*citing Williams v. River*

*Rouge,* 909 F.2d 151, 153 n. 4 (6th Cir.1990); *Balogh v. Charron,* 855 F.2d 356 (6th Cir.1988)).

**13.** *But see Baker v. Hadley,* 72 F.3d 129 (6th Cir.1995) (Table), 1995 WL 717029 (unpublished per curiam) (characterizing the 1993 *Mumford* decision as squarely ruling that a chief referee was not insulated from patronage dismissal), *cert. denied,* —— U.S. ——, 116 S.Ct. 1876, 135 L.Ed.2d 172 (1996).

claim initiated under 42 U.S.C. § 1983 by a former referee for alleged patronage discharge is nonviable as a matter of law.

Rule 75(C) of the Ohio Rules of Civil Procedure creates the basic inherent duties of a Domestic Relations Court referee. Rule 75(C) posits that "Rule 53 shall apply to all cases or issues directed [by the court] to be heard by a referee." As this court resolved in *Mumford*, 4 F.3d at 430 n. 1:

> Pursuant to Ohio Rules of Civil Procedure 53 and 75, the court may appoint one or more referees to hear an issue or issues in any case in which the parties are not entitled to a trial by jury or in any case in which the parties consent in writing or in the record in open court, to submit an issue or issues to a court-appointed referee. A referee in the Domestic Relations Division of the Common Pleas Court is an agent and officer of the appointing court and is clothed with the powers and duties of the judicial office which appoints him.

(Citations omitted).

The powers of the referee include, *inter alia*, the conduct of hearings on the matters referred to him, the issuance of subpoenas, the swearing and examination of witnesses, and (unless otherwise specified in the order of reference) the promulgation of evidentiary rulings and the entry of certain pretrial, discovery, temporary restraining, and other orders necessary to regulate the proceedings, all without judicial ratification. Ohio R. Civ. P. 53(C)(2) & (3). However, the referee's decisions otherwise are mere recommendations which become effective only upon adoption by the court. Ohio R. Civ. P. 53(E)(4)(a).

Unquestionably, the inherent duties of an Ohio domestic relations court referee entail a relationship of confidence between the referee and the judge(s) which he serves. The referee is privy to confidential litigation materials and internal court communications in the discharge of his duties, and further maintains a personal confidential relationship with the judge(s) which he serves. *See Blair*, 76 F.3d at 101; *Balogh v. Charron*, 855 F.2d 356 (6th Cir.1988). Moreover, the referee effectively makes policy for, or suggests policy to, the court on each occasion that he resolves a dispute in the court's name or recommends a disposition to a judge. Consequently, his supervising judge must be convinced that the judgment capabilities of the referee, and the confidential relationships that arise as a result of the intimate judicial and quasi-judicial discussions, are unquestionable. The referee's political ideology, associations, and activities may rationally influence a judge's assessment of an individual's suitability for a position as his referee.

Since the hearing of this appeal, this circuit in *McCloud v. Testa*, 97 F.3d 1536 (6th Cir.1996), outlined four general categories of public occupations characterized as "political" which are validly subject to patronage considerations and therefore are not shielded by the First Amendment:

> **Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

> **Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

> **Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors; [and]

> **Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*Id.* at 1557 (notes omitted).

The inherent duties of an Ohio domestic relations court referee, as illuminated above,

satisfy the strictures of categories one, two, and three, as Ohio law expressly assigns some discretionary adjudicative authority to the referees, permits Ohio judges to delegate other adjudicative powers to the referees, and provides that the referees shall proffer advice (often in confidence) to the judges concerning the disposition of cases and other legal controversies.

For these reasons, this court is constrained to rule that Mumford's former position as a referee for the Domestic Relations Court was an inherently political post which was not safeguarded from political patronage termination by the First Amendment, and therefore the plaintiff's official capacity claim under section 1983 must be rejected.

■■ Finally, this appellate review considers the trial court's ruling that Mumford's request for equitable relief became moot upon the expiration of Zieba's judicial term and the assumption of the duties of Administrative Judge by Basinski. The district court decided that no relief remained available to Mumford because Zieba (the allegedly offending individual) was no longer a party to the lawsuit, and because no conclusive evidence indicated that Basinski (the sole remaining defendant) had followed, or intended to continue, the allegedly offensive employment practices of Zieba. *Mumford v. Zieba,* 915 F.Supp. 917, 918–19 (N.D.Ohio 1995) (*quoting Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 622, 94 S.Ct. 1323, 1334, 39 L.Ed.2d 630 (1974)). The lower court's analysis constituted legal error.

In *Mayor of Philadelphia,* the Court dictated that no prospective coercive relief can issue against a current public official which is designed to forestall *future* discriminatory practices of a type committed by the official's *predecessor in office,* in the absence of findings that the successor official intends to continue his predecessor's discriminatory practices. 415 U.S. at 622, 94 S.Ct. at 1334. This rule has no application in the instant case. Mumford's cause of action against Zieba sought relief from *alleged past unconstitutional employment discrimination against him,* not to preclude perpetration of similar discriminatory practices against others in the future. Federal Rule of Civil Procedure 25(d) provides for the automatic substitution of a successor public official upon the departure from office of a person named in official capacity litigation:

> (1) When a public officer is a party to an action *in his official capacity* and during its pendency dies, resigns, or otherwise *ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party.* Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded. An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution.
>
> (2) *A public officer who sues or is sued in an official capacity may be described as a party by the officer's official title rather than by name;* but the court may require the officer's name to be added.

(Emphases added).

The Supreme Court has observed that "[t]he rules effectuating automatic substitution of public officers were specifically designed to prevent suits involving public officers from becoming moot due to personnel changes. See Advisory Committee Notes on 1961 Amdt. to Fed.Rule Civ.Proc. 25(d)(1), 28 U.S.C., pp. 568–569." *Karcher v. May,* 484 U.S. 72, 83, 108 S.Ct. 388, 395, 98 L.Ed.2d 327 (1987). Because Mumford's action against Zieba as the Administrative Judge of the Domestic Relations Court was effectively a claim against the *office* of Administrative Judge, see Fed.R.Civ.P. 25(d)(2), the claim (if otherwise valid) would survive Zieba's departure from the bench. *See, e.g., Gonzalez Torres v. Toledo,* 586 F.2d 858, 859–60 (1st Cir.1978). Consequently, the substitution of Basinski in Zieba's stead did not render Mumford's cause against the Administrative Judge of the Domestic Relations Court moot. Rather, as developed above, Mumford's official capacity case must be dismissed on the alternate rationales that (1) the Eleventh Amendment precluded it as a jurisdictionally improper claim against a state government prosecuted in federal court, and (2) the First Amendment as a matter of law did not pro-

tect Mumford's former position as a court referee.

Accordingly, although this review rejects the reasoning of the district court, it hereby **AFFIRMS**, for the foregoing reasons, the judgment of September 28, 1995 dismissing the plaintiff's complaint.