# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 28, 2020

Lyle W. Cayce
Clerk

No. 19-40664

Bernice Garza,

*Plaintiff—Appellant*,

*versus*

Omar Escobar, Jr., *in his official capacity as District Attorney and in his personal capacity*; Starr County, Texas,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:18-CV-249

Before Southwick, Costa, and Duncan, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Bernice Garza was the Crime Victims Unit Coordinator for the 229th Judicial District Attorney's Office, which covers Duval, Jim Hogg, and Starr Counties in south Texas. She was fired because of political disagreements with her boss, Omar Escobar, Jr., the District Attorney. The district court dismissed her First Amendment claim, concluding Garza could be subjected to patronage dismissal without violating the Constitution. We affirm.

No. 19-40664

## I.

Because the case was dismissed under Federal Rule of Civil Procedure 12(c), we accept all well-pled facts in Garza's complaint as true. *See Guidry v. Am. Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

## A.

In happier times, Garza and Escobar "were friends and were aligned with respect to local politics." Garza and her sister, Leticia Garza Galvan ("Galvan"), helped Escobar with his successful 2012 campaign for District Attorney. In 2015, Escobar hired Garza to serve as the Coordinator of the Crime Victims Unit ("CVU") for the DA's office. Her job was to help crime victims, for instance by securing them counseling services and preparing them to testify at trial. As CVU Coordinator, Garza led the department, supervising five employees, onboarding interns, and managing the office's grant process. Garza received two raises during her tenure, both approved by Escobar. While serving as CVU Coordinator, she worked on Escobar's 2016 reelection campaign and was "placed in a position of confidence between Escobar and the other persons working for his campaign." Following his reelection, Escobar continued to involve Garza in his political plans, discussing with her which candidates to support for local offices.

Soon after, however, Garza's relationship with Escobar "began to deteriorate" because "Escobar objected to the political views and activities of [Garza] and her family." Specifically, Escobar did not want Garza's sister, Galvan, to run for office because it would disrupt his own political plans. Escobar badgered Garza about this daily, to the point that she had to take medication to quell her distress. In April 2017, after Garza told a co-worker she wanted to quit, Escobar demanded to meet with her. At the meeting, "Escobar continued criticizing [Galvan] and her decisions, and tried to convince [Garza] that she should be the one running for office rather than her

2

sister." Garza told Escobar she wanted to do her job without politics intruding.

Around this time, a separate dispute developed between Escobar and Galvan over replacing a local school's athletic director. Galvan, a member of the school district's Board of Trustees, voted in a way that rankled Escobar and "[t]his was apparently too much for . . . Escobar to bear." Escobar warned Galvan that, if she ran for office, she would lose because he would not help her. He also reminded her that he employed her sister, which Galvan viewed as a threat to retaliate against Garza.

Things continued south. In August 2017, Escobar blamed Garza for an assistant DA's decision not to run for county judge. Escobar "did not speak to [Garza] for several days," blaming her for putting his political plans "in tatters." In September 2017, Escobar ordered Garza to "barge into" a meeting between the County Auditor and two assistant DAs, but she refused. She later denied knowing anything about the meeting, further angering Escobar. Garza reminded Escobar that she would not discuss politics, but he warned her that any work on her sister's campaign had to be done outside the office. After this, Escobar "ceased communication" with Garza and would talk only to Garza's subordinates. Escobar ordered her subordinates to help him prepare for trial, work Garza used to do herself. Nonetheless, Garza "would still help them prepare, but without Escobar's knowledge."

In October 2017, Galvan kicked off her campaign for county judge. "Escobar suddenly decided to throw all in with [Galvan's opponent's] slate," and soon "began sending cryptic messages intended to intimidate [Garza] from assisting her sister's campaign." In December 2017, Escobar sent Garza a message referring to a new Texas Election Code amendment that increased penalties for election offenses. "Escobar vaguely warned that there would be arrests made." "At this point, [Garza] . . . was working mostly

half-days" and "[t]he atmosphere was tense and awkward around the office with no communication with Escobar." Garza then requested a two-and-a-half month leave of absence, without pay, which Escobar approved. During her time away, Garza worked on her sister's campaign.

Garza returned to the office March 19, 2018, and immediately asked to meet with Escobar. Escobar's response was to order an investigator to bar Garza from the office. Minutes later, a court officer escorted Garza off the premises. The human relations department told Garza she had been "suspended without pay pending the outcome of a current election fraud investigation in Starr County." Garza later learned her employment was terminated on April 4, 2018.

**B.**

Garza sued both Escobar and Starr County (collectively, "Defendants") in federal district court under 42 U.S.C. § 1983, alleging political retaliation in violation of the First Amendment. Defendants moved for judgment on the pleadings, arguing that Garza's government position was subject to "patronage dismissal" and therefore not entitled to First Amendment protection. Escobar also asserted qualified immunity.

The district court, in a careful and thorough opinion, granted Defendants judgment on the pleadings, holding Garza was not entitled to First Amendment protection. Specifically, the court concluded that political loyalty was an appropriate requirement for Garza's position as CVU Coordinator and that she was therefore subject to patronage dismissal. *See, e.g., Wiggins v. Lowndes Cty., Miss.*, 363 F.3d 387, 390 (5th Cir. 2004) (patronage dismissal may survive First Amendment challenge when "political allegiance 'is an appropriate requirement for the effective performance of the public office involved'") (quoting *Branti v. Finkel*, 445 U.S. 507, 518 (1980)). In the alternative, the court ruled that Escobar would

be shielded by qualified immunity. *See, e.g.*, *Gentry v. Lowndes Cty., Miss.*, 337 F.3d 481, 487 (5th Cir. 2003) (qualified immunity may be warranted in "political patronage" cases where controlling authority does not settle propriety of dismissal in "sufficiently analogous" situations) (quoting *Gunaca v. Texas*, 65 F.3d 467, 475 (5th Cir. 1995)). Finally, the court dismissed Garza's claim against Starr County given the lack of an underlying constitutional violation, and also because Garza identified no official county policy or policymaker as the moving force behind any alleged violation. *See, e.g., Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (discussing prerequisites for municipal liability under § 1983); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978) (same).

Garza timely appealed.[1]

## II.

We review dismissal under Rule 12(c) *de novo. Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015) (citing *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 684 (5th Cir. 2010)). "A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76

---

[1] Defendants contest our appellate jurisdiction because, they say, Garza's Notice of Appeal ("NOA") was untimely. A motions panel of this court has rejected that argument once, and we reject it again. Garza timely filed a NOA following denial of her Rule 59(e) motion. *See* Fed. R. App. P. 4(a)(4)(A); *see also United States v. One 1988 Dodge Pickup*, 959 F.2d 37, 40 (5th Cir. 1992) ("Any motion that draws into question the correctness of the judgment is functionally a motion under Rule 59(e)." (cleaned up)).

(5th Cir. 1990)); *see also* 5A WRIGHT & MILLER, FED. PRAC. AND PROC. § 1367, at 509–10 (1990). "The standard for dismissal under Rule 12(c) is the same as that under Rule 12(b)(6)." *Hale v. Metrex Research Corp.*, 963 F.3d 424, 427 (5th Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017)). "[B]ut we are not bound to accept as true a legal conclusion couched as a factual allegation." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

### III.

As a threshold matter, Garza contends the district court erred in disposing of the case on a Rule 12(c) motion. She claims our decision in *Burnside v. Kaelin*, 773 F.3d 624 (5th Cir. 2014), requires denying a Rule 12(c) motion when the claim requires analysis under *Pickering v. Board of Education*, 391 U.S. 563 (1968). *Pickering* asks courts, when evaluating First Amendment retaliation claims, to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick v. Myers*, 461 U.S. 138, 142 (1983) (alteration in original) (quoting *Pickering*, 391 U.S. at 568). We disagree.

In *Burnside*—which also involved a First Amendment retaliation claim—we said that "[i]n stating a prima facie case at the motion-to-dismiss stage of a case, there is a rebuttable presumption that no balancing is required to state a claim." 773 F.3d at 628. But we immediately explained that statement: "[t]he rebuttable presumption applies because reasonable inferences drawn from a complaint, obviously drafted by the aggrieved employee, will *generally* lead to a plausible conclusion that the employee's interest in commenting on matters of public concern outweighs the

employer's interest in workplace efficiency." *Id.* (emphasis added). We then determined that the complaint in that case contained nothing indicating that the plaintiff's interest in commenting on an election was outweighed by the employer's interest in an efficient workplace. *Id.*

*Burnside* does not preclude disposing of this case at the Rule 12(c) stage. To begin with, unlike *Burnside*, this case does not involve a "pure" *Pickering* analysis. As explained below, *see infra* IV(A)(2)–(3), because Garza functioned as a policymaker, her dismissal was allowed as long as the pleadings show her political activities "in some way adversely affect[ed]" the functioning of the DA's office. *See Vojvodich v. Lopez*, 48 F.3d 879, 887 (5th Cir. 1995). Thus, there is more to the inquiry here than a pure weighing of interests as was the case in *Burnside*, so *Burnside* is not on point.

And in any event, *Burnside* says only that there is a *rebuttable presumption* at the motion-to-dismiss stage that no balancing is needed to state a First Amendment retaliation claim. But, as *Burnside* explains, that presumption may be rebutted when "reasonable inferences drawn from a complaint" do not plausibly show that the employee's interests outweigh the employer's. 773 F.3d at 628. In such a case, *Pickering* balancing can be performed at the motion-to-dismiss stage. That makes sense because "[a]pplication of the *Pickering* balancing test is a question of law," *Bickel v. Burkhart*, 632 F.2d 1251, 1256 (5th Cir. 1980), and it would be "illogical to say that something is a question of law, and that it is reviewed de novo, yet that it can never be decided on the pleadings." *Weisbuch v. Cty. of Los Angeles*,

119 F.3d 778, 783 n.1 (9th Cir. 1997). For that reason, our court has previously applied *Pickering* balancing at the pleading stage, as have other circuits.[2]

To put things more bluntly: if a plaintiff pleads her way into *Pickering* balancing, *Burnside* does not require courts to ignore the very facts she pled—indeed, at this stage, the court *must accept them as true. See Hale*, 963 F.3d at 427. Here, the district court concluded that, based on the detail provided by Garza's allegations, balancing the parties' interests was not precluded at the Rule 12(c) stage. We agree, and thus proceed to the merits.

## IV.

Garza argues that the district court erred in dismissing her case based on the "patronage dismissal exception" to First Amendment retaliation claims. She also argues that the court erred in dismissing her municipal liability claims against Starr County. We hold that Garza's position as CVU Coordinator is one for which "party affiliation is an appropriate requirement for effective performance," *Branti*, 445 U.S. at 518, and the First Amendment thus did not shield her from dismissal. Our second holding flows from the first: because Garza has not plausibly alleged a constitutional claim, her municipal liability claim was also properly dismissed. We therefore affirm the district court's judgment.

### A.

#### 1.

We assume, without deciding, that Garza plausibly pled a prima facie claim of First Amendment retaliation. *See Maldonado v. Rodriguez*, 932 F.3d

---

[2] *See Phillips v. City of Dallas*, 781 F.3d 772 (5th Cir. 2015); *see also, e.g.*, *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) (*Pickering* analysis done on a Rule 12(c) motion); *Jordan v. Carter*, 428 F.3d 67 (1st Cir. 2005) (same); *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) (same).

388, 391 (5th Cir. 2019) ("A First Amendment political retaliation claim requires proof that a plaintif (a) suffered an adverse employement action (b) because of (c) his 'speech or activity related to a matter of public concern.'") (quoting *Aucoin v. Haney*, 306 F.3d 268, 274 (5th Cir. 2002)). The dispute here is whether Garza's former position nevertheless falls within the patronage dismissal exception to the First Amendment's protection.

"[B]ecause 'political belief and association constitute the core of those activities protected by the First Amendment,' the practice of patronage dismissals 'clearly infringes First Amendment interests.'" *Aucoin*, 306 F.3d at 272 (quoting *Elrod v. Burns*, 427 U.S. 347, 356, 360 (1976)). But if "an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti*, 445 U.S. at 517.

To find shelter under the First Amendment, Garza must show that the speech or activity at issue—here, campaigning for her sister—implicated an issue of public concern. *Vojvodich*, 48 F.3d at 884. Plainly it did. *Id.* at 885; *Aucoin*, 306 F.3d at 274. Defendants "then must establish that [the government's] interest in promoting the efficiency of the services provided by its employees outweighs [Garza]'s interest in engaging in the protected activity." *Vojvodich*, 48 F.3d at 885; *see also Maldonado*, 932 F.3d at 391. "This analysis in reality is a sliding scale or spectrum upon which 'public concern' is weighed against disruption." *Vojvodich*, 48 F.3d at 885; *see also Maldonado*, 932 F.3d at 392.

"When nonpolicymaking, nonconfidential employees are discharged solely because of their private political views, little, if any weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary, and the employee's rights will usually prevail."

*Id.* at 392 (quoting *Gentry*, 337 F.3d at 485–86). On the other end of the spectrum, though, "are cases where employees' exercise of First Amendment privileges clearly over-balanced [their] usefulness." *Id.* (alteration in original) (quoting *Gentry*, 337 F.3d at 485–86). When "public employees . . . occupy policymaker or confidential positions . . . the government's interests more easily outweigh the employee's." *Brady v. Fort Bend Cty.*, 145 F.3d 691, 707–08 (5th Cir. 1998).

Policymakers are "public employees whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors." *Aucoin*, 306 F.3d at 273 (quoting *Stegmaier v. Trammell*, 597 F.2d 1027, 1035 (5th Cir. 1979)). Employees may be policymakers if they "control[] or exercise[] a role in a decision making process as to the goals and general operating procedures of (an) office." *Id.* (quoting *Stegmaier*, 597 F.2d at 1035). Whether an employee's "responsibilities . . . are not well defined or are of broad scope" is also illuminating. *Elrod*, 427 U.S. at 367–68.

A government employee may be "confidential" "if he or she stands in a confidential relationship to the policymaking process, e.g., as an advisor to a policymaker, or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, e.g., as a private secretary to a policymaker." *Maldonado*, 932 F.3d at 393 (quoting *Wiggins*, 363 F.3d at 391).

Concluding an employee occupies a confidential or policymaking role, however, does not completely answer whether the employee can properly be subject to patronage dismissal. *See Vojvodich*, 48 F.3d at 884. While the labels "policymaker" and "confidential" are helpful, "the [ultimate] question is

whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." *Branti*, 445 U.S. at 518. We make that determination based on the specific facts of each case. *See Maldonado*, 932 F.3d at 392 ("The balancing test is case-specific.").

**2.**

Our first task is to determine whether Garza functioned as a confidential employee or a policymaker when she worked as the CVU Coordinator. We conclude that she did. Our court has not previously examined this specific position, but our decisions guide our inquiry.

In *McBee v. Jim Hogg County*, we held that a sheriff's law enforcement staff—comprised of six deputies and four dispatchers—were subject to patronage dismissal. 703 F.2d 834, 841 (5th Cir. 1983). This was so, we reasoned, because they were "individuals . . . responsible for ensuring that the sheriff's policies were properly implemented," they "were representatives of [the] sheriff to the public," they "were involved in virtually every law enforcement activity, usually acting alone without supervision," and they performed work "closely on a personal and confidential basis." *Id.* at 842. We found "it difficult to imagine how such an office could have effectively carried out its vitally important duties in the public trust when the sheriff did not have absolute confidence in his small staff." *Id.*

In *Aucoin v. Haney*, we joined our sister circuits and held that "an assistant district attorney falls within the *Elrod-Branti* policymaker exception." 306 F.3d at 276. We noted the "broad discretionary powers" vested in district attorneys under Louisiana law and that assistant district attorneys "may perform the duties of officials under whom they serve"— i.e., the district attorney. *Id.* at 275. Further, the plaintiff oversaw and "had

great discretion in handling the misdemeanor docket" and performed his duties with little direct supervision from the district attorney. *Id.* at 276. Given the breadth and independence of the plaintiff's duties, we concluded he functioned as a policymaker. *Id.*

In *Maldonado v. Rodriguez*, we held that the commander and assistant commander of a drug trafficking area task force, as well as department investigators, were likely not protected from patronage dismissal. 932 F.3d at 392. We noted that even though those positions were "perhaps not as intimately connected with the DA's duties as assistant prosecutors," they "held more responsible and discretionary positions than ordinary investigators." *Id.* at 395. We observed that our "case law strongly suggests that certain employees in the District Attorney's office, in addition to assistant DAs, must be terminable for their political activity," when they "have significant discretion or input into deciding what kinds of crimes to pursue with limited resources, which cases to pursue, how to conduct investigations, executions of warrants and arrests, and whether to recommend lenient or severe punishments." *Id.* at 394. We also explained that "the prosecutorial function of the [DA] is laden with ideological content which is the subject of public debate and electoral choices," that "the office must be sensitive to [the elected DA]'s policy demands as represented to the voters[,] . . . [a]nd the DA is ultimately responsible for every interaction between his office and the public." *Id.* (cleaned up).

In contrast, we have also examined positions that were not confidential or policymaking. In *Wiggins v. Lowndes County*, for example, we held that a county road foreman was neither. 363 F.3d at 392. We observed that the plaintiff merely implemented projects determined by superiors; assigned work to the road crew and supervised work in the field; inspected equipment; maintained records; inspected roads and bridges; and performed other assigned duties. *Id.* at 391. Likewise, he had no access to confidential

documents, could not create personal liability for his superiors, and had a measure of protection from the Board of Supervisors. *Id.* These factors demonstrated that the employee did not function as a policymaker or confidential employee. *Id.*

Applying our precedents thus leads us to conclude that Garza functioned as a policymaker and confidential employee in her work as CVU Coordinator. This position is a creature of Texas law. *See* TEX. CODE CRIM. PROC. art. 56.04(a).[3] The coordinator's duty is to ensure that victims of crimes are "afforded the rights granted victims, guardians, and relatives" by Texas law.[4] *Id.* (b). In discharging that responsibility, the coordinator is to "work closely with appropriate law enforcement agencies, prosecuting attorneys, the Board of Pardons and Paroles, and the judiciary." *Id.*

Garza's allegations underscore the breadth of her responsibilities. As CVU Coordinator, she was "the head of that department" and supervised five other employees. As department head, she ultimately "shoulder[ed] the important responsibility of communicating with and assisting crime victims." This work included, "[a]mong other things, . . . assist[ing] these vulnerable victims by securing counseling services and by preparing them for trial." Garza took the lead in these important roles. In addition to those responsibilities, Garza was "the grant manager for the 229th Judicial District Attorney's Office," and she "prepar[ed] and manag[ed] grant requests."

These allegations, together with her statutory duties, establish that Garza functioned as a policymaker and confidential employee as CVU

---

[3] "The district attorney, criminal district attorney, or county attorney who prosecutes criminal cases shall designate a person to serve as victim assistance coordinator in that jurisdiction."

[4] Texas law dedicates an entire chapter of the Code of Criminal Procedure to detailing the rights of crime victims. *See* TEX. CODE CRIM. PROC. art. 56.01 *et seq*.

Coordinator. First, her responsibilities required much more than "simple ministerial competence," *see Aucoin*, 306 F.3d at 273, and were broad in scope, *see Elrod*, 427 U.S. at 367; *Aucoin*, 306 F.3d at 276. This makes it "more likely" that she functioned as a policymaker. *See Elrod,* 427 U.S. at 367–68. Although Garza tries on appeal to undersell the importance of her former position, her allegations demonstrate that she enjoyed substantial discretion in discharging her statutory duties. This supports a finding that she was a policymaker. *See Aucoin*, 306 F.3d at 273.

Second, Garza represented the DA's office to crime victims. State law and Garza's own allegations demonstrate that she took the lead in ensuring that victims and their relatives enjoyed all the rights to which they are entitled. *See* TEX. CODE CRIM. PROC. art. 56.04(b). Garza was "responsible for ensuring that the [DA]'s policies were properly implemented" regarding the office's interaction with crime victims. *See McBee*, 703 F.2d at 842. The importance of her duties is underscored by the allegation that, after the rift developed between Garza and Escobar, "the proper preparation of crime victims to testify at trial" was not executed as well as it should have been.

Third, Garza also represented the DA's office in interactions with other members of the law enforcement community to secure victims' rights. *See* TEX. CODE CRIM. PROC. art. 56.04(b). In her work with "law enforcement agencies, prosecuting attorneys, the Board of Pardons and Paroles, and the judiciary," Garza was the public face of the DA's office and responsible for implementing Escobar's policy choices in those interactions. Escobar was thus entitled to expect, "without question, undivided loyalty." *Stegmaier*, 597 F.2d at 1040.

Fourth, Garza's job responsibilities required her to work closely with government attorneys and handle sensitive, confidential information. Garza explained that her duties included preparing "vulnerable victims" for trial

and "securing counseling services" for them. She was also required to ensure that victims received the rights owed them under state law. *See, e.g.*, TEX. CODE CRIM. PROC. art. 56.02. In discharging these responsibilities, Garza would have handled sensitive information from victims and their families, and would have been required to maintain confidentiality in her work with the office's attorneys. That close work with government attorneys supports the conclusion that she functioned as a confidential employee. *See Aucoin*, 306 F.3d at 275.

Finally, Garza's other responsibilities also illustrate her policymaking role. She was the office grant manager. She supervised several other employees. She was in charge of accepting interns. She had input regarding Escobar's personnel decisions. These are responsibilities that we, as well as other courts, view as supporting the conclusion that an employee functioned as a policymaker. *See Gentry*, 337 F.3d at 488 (budgetary work supports finding of policymaker); *see also Peterson v. Dean*, 777 F.3d 334, 347 (6th Cir. 2015) ("[B]udgetary decisions are among the most significant, and the most political, actions which government officials take."); *Hobler v. Brueher*, 325 F.3d 1145, 1147 (9th Cir. 2003) (secretary who advised prosecutor regarding hiring decisions was confidential).

We conclude that Garza's allegations, taken as true, together with the statutory description of her position, show she functioned as a policymaker and a confidential employee in her role as CVU Coordinator.

**3.**

The conclusion that Garza served a confidential and policymaking role helps, but does not end, our analysis. As explained, the ultimate inquiry in patronage dismissal cases is whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. To answer that question, some of our cases also ask

whether "the employee's activities in some way adversely affect[ed] the government's ability to provide services." *Vojvodich*, 48 F.3d at 887. We conclude that, on the facts alleged, Garza's activities could have adversely affected—and did adversely affect—the DA's ability to serve the public and that political affiliation is thus an appropriate requirement for the position.

In conducting this inquiry, a lack of evidence that actual disruption occurred is not dispositive because we do not require employers to wait until their office is disrupted before taking action. *See Connick*, 461 U.S. at 152. Rather, where close working relationships are involved, courts accord "a wide degree of deference to the employer's judgment." *Id.* Close working relationships are crucial in public attorneys' offices. *See id.* at 151–52; *see also Lumpkin v. Aransas Cty.*, 712 F. App'x 350, 359 (5th Cir. 2017).

With those principles in mind, we conclude that Garza's political affiliation and actions disrupted the work of the DA's office. After Garza's political actions, Escobar was unable to place absolute confidence in her performance of her vital statutory duties. As discussed, Garza oversaw the office's work with victims and their families. *See* TEX. CODE CRIM. PROC. art. 56.04(b). She was to "work closely with appropriate law enforcement agencies, prosecuting attorneys, . . . and the judiciary." *Id.* In performing those duties, Garza was representing Escobar, the elected DA. He was thus entitled to her loyalty and needed confidence in her representation. *See Aucoin*, 306 F.3d at 276; *see also Hobler*, 325 F.3d at 1152 (prosecutor entitled to loyal secretaries who would carry out his policies). But the rift between them ruptured this trust. That breakdown would have impeded the DA's provision of services to the public. "[I]t [is] difficult to imagine how [the DA's] office could have effectively carried out its vitally important duties [to crime victims] when the [DA] did not have absolute confidence" in his CVU Coordinator. *See McBee*, 703 F.2d at 842. Further, Garza was tasked with "work[ing] closely" with, among other groups, "the judiciary." Yet she was

actively seeking to unseat at least one judge by supporting her sister's candidacy. It is easy to see that such a conflicting position may have hampered the ability of the DA's office to discharge its duties.

Garza herself details how her activities "adversely affect[ed] the government's ability to provide services." *Vojvodich*, 48 F.3d at 887. Garza—a *department head*—alleges that communication with Escobar broke down almost completely. After Escobar began shifting her work to other employees, Garza defied his wishes and contined to prepare witnesses for trial. This "undercurrent of duplicity" from a department head would unavoidably "impede the 'close working relationships[]' which the Supreme Court has specifically held to be crucial in public attorney's offices." *Lumpkin*, 712 F. App'x at 359. Further, Garza worked half-days and took a leave of absence that lasted over two months. Garza herself tells us what the result of all this was: "the proper preparation of crime victims to testify at trial" and "the efficient and effective functioning of the Crime Victims Unit"—a key department in the DA's Office—was "sacrificed."

Further supporting our conclusion, we have recognized that "[t]he political sensitivity of DA offices is reinforced in Texas law by statutory provisions that enable the DA to hire all office personnel required for the proper and efficient operation and administration of the office, render all such personnel subject to removal at will, and render investigators under the exclusive authority and direction of the prosecuting attorney." *Maldonado*, 932 F.3d at 394. "Once the DA is [elected], the office must be sensitive to that official's policy demands as represented to the voters. . . . [T]he DA is ultimately responsible for every interaction between his office and the public." *Id.* at 392. Here, Garza's lack of loyalty led to a deterioration of her working relationship with Escobar, and to her eventual defiance of his instructions. As we have detailed, this disobedience contravened her statutory duties, which included the obligation to "work closely with . . .

prosecuting attorneys" in securing the rights of crime victims. *See* TEX. CODE CRIM. PROC. art. § 56.04(b).

For these reasons, we conclude that Garza's actions disrupted the efficient and effective functioning of the DA's office and thus that her position is one for which political affiliation is an appropriate requirement. *See Branti*, 445 U.S. at 518. Garza's employment was therefore not shielded by the First Amendment, and, as the district court correctly concluded, she was subject to patronage dismissal. Judgment on the pleadings in favor of Escobar on this issue was appropriate. *See* FED. R. CIV. P. 12(c).[5]

## B.

Garza also asserted a municipal liability claim against Starr County based on Escobar's conduct, and an official capacity claim against Escobar. The district court dismissed the municipal liability claim because Garza failed to plausibly allege a constitutional violation. It also dismissed the official capacity claim as duplicative of the claim against Starr County.

The district court was correct in both regards. *See Hicks-Fields v. Harris Cty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017) ("[E]very *Monell* claim requires an underlying constitutional violation." (quotation marks omitted)); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (official capacity claims properly dismissed where "allegations duplicate claims against the respective governmental entities themselves.").[6]

---

[5] Because we conclude that Garza was subject to the *Elrod-Branti* exception, we do not address Escobar's alternative argument that he is entitled to qualified immunity from Garza's § 1983 claims.

[6] Garza briefly argues that her official capacity claim against Escobar was not duplicative of the claim against Starr County because Escobar's office embraces two other counties. She cites no relevant legal authority supporting this proposition, and other than pointing out that the office covers three counties, offers no arguments as to

No. 19-40664

\* \* \*

The judgment of the district court is AFFIRMED.

---

why the claims are not duplicative. She thus fails to demonstrate the district court erred. *See Osborne v. Coleman Co.*, 602 F.2d 725, 726 (5th Cir. 1979) (appellant bears burden of convincing court of appeals that district court erred); *see also Brinkmann v. Dallas Cty. Sheriff*, 813 F.2d 744, 748 (5th Cir. 1987) (failure to offer substantive legal arguments "is the same as if [petitioner] had not appealed that judgment").