# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 25, 2024

Lyle W. Cayce
Clerk

No. 22-51126

Harold E. Rafuse,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

Advanced Concepts and Technologies, International, L.L.C.; Michael Niggel,

*Defendants—Appellants/Cross-Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:20-CV-718

Before Davis, Engelhardt, and Oldham, *Circuit Judges*.[*]

Per Curiam:[**]

Defendants-Appellants/Cross-Appellees Advanced Concepts and Technologies Int'l, L.L.C. ("ACT I") and Michael Niggel, as well as Plaintiff-Appellee/Cross-Appellant Harold Rafuse, appeal the district court's

---

[*] Regarding Defendant-Appellant/Cross-Appellee ACT I's counterclaim seeking indemnity from Plaintiff-Appellee/Cross-Appellant Harold Rafuse, Judge Davis concurs in the judgment only.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

dismissals with prejudice, pursuant to Federal Rule of Civil Procedure 12(c), of their contractual indemnity claims. We affirm the district court's dismissal rulings except with respect to ACT I's indemnity counterclaim against Rafuse, and remand for further proceedings.

## I.

ACT I, a private company, provides "aviation, defense, and aerospace" solutions and "total acquisition management services." Its clients include federal government agencies—including the Department of Defense and the Department of Homeland Security. Rafuse and Niggel co-founded and, until Rafuse's June 30, 2008 sale of his 50% ownership interest to ACT I, co-owned the company. Before the sale, Rafuse also was a managing director, officer, and employee of ACT I.[1] After the sale, Niggel became ACT I's sole owner/member.

Twelve years later, in June 2020, ACT I paid $448,238 to the federal government following the government's completion (in 2014) of a reconciliation audit of its contracts with ACT I for three years (2005–2008) during which Rafuse was still a 50% owner of the company.[2] When ACT I then sought reimbursement from Rafuse of 50% of the $448,238 that ACT I had paid to the government, Rafuse refused and filed a declaratory action (in state

---

[1] In addition to selling his interest in ACT I, Rafuse withdrew as an ACT I member, resigned all positions with ACT I (and its subsidiaries), signed a non-disclosure agreement, and agreed to not compete with ACT I (and its subsidiaries) for a period of 5 years. The specifics of Rafuse's involvement in ACT I's day-to-day operations prior to the June 2008 sale is unclear.

[2] According to the August 3, 2020 answer and counterclaim filed by ACT I and Niggel, the government initially claimed that ACT I was obligated to refund approximately $2.7 million for the 2005–2008 contract period. Disputing that amount, ACT I contested the audit methodology and undertook negotiations with the government. As a result, though the government's audit of the 2005–2008 contract period was completed in 2014, the matter was not fully resolved until ACT I's $448,238 payment on June 30, 2020.

court) against ACT I and Niggel seeking a determination of his alleged indemnity obligation to ACT I. In response, ACT I filed a mirroring counterclaim against Rafuse, alleging breach of contract. Following removal of the action to federal court, Rafuse filed an amended complaint, on August 21, 2020, seeking, among other things, indemnity from Niggel for any amounts that Rafuse might be obligated to pay ACT I and for the attorney's fees and expenses incurred in this litigation.

Thereafter, the parties filed a number of motions. Pertinent to this appeal and cross-appeal, Rafuse's motion sought judgment on the pleadings or, in the alternative, summary judgment. The motion filed by ACT I and Niggel sought summary judgment. Treating both motions as Rule 12(c) motions for judgment on the pleadings,[3] the district court rejected all of the parties' indemnity claims and dismissed them with prejudice. This appeal followed.

## II.

We review a district court's ruling on a motion for judgment on the pleadings, pursuant to under Federal Rule of Civil Procedure 12(c), *de novo*. *Garza v. Escobar*, 972 F.3d 721, 727 (5th Cir. 2020); *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010) (citing *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)). A Rule 12(c) motion for judgment on the pleadings is evaluated using the same standard applicable to a Rule 12(b)(6) motion seeking dismissal for failure to state a claim. *Gentilello*, 627 F.3d at 543–44 (citing *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir. 2008)).

---

[3] The district court did not consider the affidavit and deposition testimony submitted by ACT I and Niggel in support of their motion.

No. 22-51126

"A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Garza*, 972 F.3d at 727 (quoting *Great Plains Tr. Co.,* 313 F.3d at 312); *see also* 5A Wright & Miller, Federal Practice and Procedure § 1367, at 509–10 (1990). In ruling on a 12(c) motion, the court must look only to the pleadings, *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 904 (5th Cir. 2002), and exhibits attached to the pleadings. *See Waller v. Hanlon*, 922 F.3d 590, 600 (5th Cir. 2019); *Voest-Alpine Trading USA Corp. v. Bank of China,* 142 F.3d 887, 891 n.4 (5th Cir. 1998). "If, on a motion under 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, if documents attached to a 12(c) motion are "referred to in the complaint and are central to the plaintiff's claim," the court may also consider them without converting the motion into one for summary judgment. *See Allen v. Hays*, 812 F. App'x 185, 189 (5th Cir. 2020) (quoting *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010)).

## III.

The contractual indemnity obligations at issue here arise from a number of agreements signed by the parties in connection with Rafuse's June 30, 2008 sale to ACT I of his 50% interest in the company. The parties agree that the agreements at issue are governed by Virginia law. Under Virginia law, "[i]t is the function of the court to construe the contract made by the parties, not to make a contract for them." *Wilson v. Holyfield,* 313 S.E.2d 396, 398 (Va. 1984) (quoting *Meade v. Wallen*, 311 S.E.2d 103, 104 (1984)). Accordingly, "[i]f the terms of the parties' agreement are contained in a clear and explicit writing, that writing is the sole memorial of the contract and the sole evidence of the agreement." *Cascades N. Venture Ltd. P'ship v. PRC, Inc.*,

4

457 S.E.2d 370, 373 (Va. 1995). "Conversely, the rule excluding parol evidence has no application where the writing on its face is ambiguous, vague, or indefinite." *Id.* "In such a case, the proper construction of the contract is an issue for the trier of fact, and the court should receive extrinsic evidence to ascertain the intention of the parties and to establish the real contract between them." *Id.* (citing *Greater Richmond Civic Recreation, Inc. v. A.H. Ewing's Sons, Inc.*, 106 S.E.2d 595, 597 (1959); *Shockey v. Westcott*, 53 S.E.2d 17, 20 (1949)); *see also Vilseck v. Vilseck,* 612 S.E.2d 746, 749 (2005) ("[I]f no patent or latent ambiguities exist, a court should enforce the plain meaning of the contractual language without resort to extrinsic evidence[;] . . . if an ambiguity exists, a court should still enforce the contract if the real meaning of the ambiguous provision can be discerned from extrinsic evidence.").

The question whether a contract is ambiguous is not one of fact but one of law. *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 561 S.E.2d 663, 667 (2002). "However, '[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used.'" *Id.* (quoting *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 557 S.E.2d 199, 200 (2002)). Rather, contract language is ambiguous when it is "objectively reasonable to understand the contractual language 'in more than one way' or to conclude that it 'refers to two or more things at once.'" *Vilseck*, 612 S.E.2d at 749 (quoting *Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 556 S.E.2d 769, 771 (2002)); *Cascades N. Venture Ltd. P'ship*, 457 S.E.2d at 373 ("Ambiguity is created by the '[d]oubtfulness [or] doubleness of meaning . . . of an expression used in a written instrument.'" (quoting *Berry v. Klinger,* 300 S.E.2d 792, 796) (Va. 1983)). In such situations, the court's task "is not to determine which of the competing interpretations is the better of the two—but whether both, though contradictory, are nonetheless reasonable." *Vilseck*, 612 S.E.2d at 749–50.

No. 22-51126

"Where a business transaction is based on more than one document executed by the parties, the documents will be construed together to determine the intent of the parties[.]" *Parr v. Alderwoods Grp., Inc.*, 604 S.E.2d 431, 435 (2004) (quoting *Countryside Orthopaedics, P.C. v. Peyton*, 541 S.E.2d 279, 284 (2001) (additional internal quotations omitted)). "[A]nd '[w]here two papers are executed at the same time or contemporaneously between the same parties in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument.'" *Id.* (quoting *Countryside Orthopaedics*, 541 S.E.2d at 284) (additional internal quotations omitted)).

IV.

As indicated, the contractual indemnity obligations at issue in these cross-appeals arise from and/or relate to five agreements executed in connection with Rafuse's June 30, 2008 sale to ACT I of his 50% interest in the company for approximately $2 million (~$1.7 million principal, plus $260K in interest), which was to be paid in equal quarterly installments over a period of five years. Four of the five documents were entered into on June 30, 2008. They are: (1) the June 30, 2008 "Limited Liability Corporation Equity Purchase and Mutual Release Agreement" (hereinafter, the "Purchase Agreement") (between ACT I, Rafuse, and Niggel); (2) the June 30, 2008 "Installment Note for a Total of $2,000,000" (hereinafter, the "Note") (ACT I to pay Rafuse in equal quarterly installments between June 2008 and March 2013 and pledging ACT I equity as collateral); (3) the June 30, 2008 "Membership Equity Pledge Agreement Accompanying Equity Purchase and Redemption Agreement and Installment Note" (hereinafter, "Pledge Agreement") (between ACT I and Rafuse); and (4) the June 30, 2008 "Indemnity Agreement for Post-Closing Events" (between ACT I and Niggel). The fifth agreement—the "Accord and Satisfaction and General Release" (between

6

No. 22-51126

ACT I and Rafuse)—was executed in 2011, with an effective date of May 31, 2011, when ACT I paid Rafuse the remaining balance owed under the Purchase Agreement and Note almost two years ahead of schedule.[4]

A.  Rafuse's Indemnity Obligation to ACT I

In granting (in part) Rafuse's motion for judgment on the pleadings, the district court dismissed ACT I's counterclaim seeking indemnity from him, pursuant to § 23 of the "Pledge Agreement," for half of the sum that ACT I had paid (reimbursed) the federal government in June 2020. Section 23 of the Pledge Agreement provides:

> 23.    Indemnity.  Buyers and Niggel, jointly and severally, hereby indemnify and agree to hold Harold E. Rafuse (the "Seller") harmless in accordance with the terms of Section 4.1 of the Operating Agreement now in effect from, against and in respect any and all debts, liabilities or obligations of Buyers or any of its subsidiaries or related companies, direct or indirect, fixed, contingent or otherwise, which arise or are alleged to have arisen after the closing date or which are based upon or arise from any act, transaction, circumstance, state of facts or other condition arising or alleged to have arisen after the Closing Date. With respect to any contract actions resulting in a liability against the company for performance or operating events occurring prior to closing[,] such as contract adjustments, audit adjustments, finance adjustments, contract claims or tax issues[,] the parties shall each be responsible for fifty percent of the negative financial impact on the company. For all other pre-closing matters the Seller shall be indemnified.

---

[4] The Purchase Agreement and Note designate March 31, 2013, as the due date for the final installment payment.

No. 22-51126

ACT I's indemnity claim is premised on the underlined text, which the district court's opinion refers to as the "Obligation Provision."[5]

As reflected in the memorandum opinion, the district court agreed with ACT I's contention that Rafuse's acceptance of shared financial responsibility (in § 23 of the Pledge Agreement), for certain *pre-closing* obligations, included the government's 2014 audit of ACT I's rates for federal contracts in the 2005–2008 time period. Thus, the district court construed the audit claim as a "contract action" for purposes of § 23 of the Pledge Agreement. But, it also concluded that the "Merger Provision" in § 7 of the May 31, 2011 Accord and Satisfaction and General Release had terminated (or discharged) the Pledge Agreement, *including* the shared financial obligation assumed by Rafuse in § 23 of that agreement.[6]

In reaching this conclusion, the district court, citing the § 7 "Merger Provision," reasoned: "In executing the [May 31, 2011] Accord and Satisfaction, ACT I satisfied all its Obligations and, according to [§] 12 of the Pledge Agreement, *terminated* the Pledge Agreement and the [shared] Obligation Provision [in § 23 of the Pledge Agreement] along with it."[7] The

―――――――――――――――

[5] *See Rafuse v. Advanced Concepts & Techs. Int'l, LLC,* No. 6:20-CV-00718-ADA, 2022 WL 3030792, at *5–9 (W.D. Tex. Aug. 1, 2022), *modified in part*, No. 6:20-CV-00718-ADA, 2022 WL 18585972 (W.D. Tex. Nov. 23, 2022) (underlining added).

[6] *Id.* at *5–6.

[7] *Id.* at *6.

Section 7 of the May 31, 2011 Accord and Satisfaction and General Release states:

> 7. This Agreement constitutes and contains the final accord and satisfaction among the Parties and the final satisfaction of all payment obligations under the Agreement and Note and the Parties entered this Agreement in reliance upon the promises and covenants contained herein. This Agreement supersedes and replaces all prior negotiations, agreements or proposed agreements, written or oral. Each Party acknowledges that any promise, representation or warranty

district court likewise emphasized the "broad" nature of the "accord and satisfaction" and the "supersedes and replaces" clauses in the § 7 "Merger Provision" of the May 31, 2011 Accord and Satisfaction and General Release, reasoning that they "confirm the parties' intention to discharge all prior agreements between Rafuse and ACT I, including the Pledge Agreement."[8]

The district court also rejected ACT I's assertion that the second sentence of § 4 of the May 31, 2011 Accord and Satisfaction and General

---

whatsoever, express or implied, written or oral, which is not contained herein is not binding nor has induced the Party to execute this agreement, and each party acknowledges that it has not executed this Agreement in reliance on any promise, representation or warranty not contained herein. This Agreement is final and may only be modified by written amendment signed by all Parties to this Agreement.

Sections 4 and 12 of the Pledge Agreement state:

4. Obligations of LLC/Pledgor. As used herein, "Obligations" shall mean all of LLC/Pledgor's liabilities, obligations, covenants and agreements under the Installment Note and Equity Purchase Agreement.

12. Performance by LLC/Pledgor. Upon full payment and performance of all of the Obligations by LLC/Pledgor and upon payment of costs and expenses provided herein, which are limited to a maximum of $10,000, this Agreement will terminate, and the Secured Party or his third party designee will deliver or caused to be delivered to LLC/Pledgor, such of the Pledged Membership Interest/Collateral that has not been sold or otherwise disposed of pursuant to this Agreement.

[8] *See Rafuse*, 2022 WL 3030792, at *6. Quoting *Virginia-Coalition Electrical Works v. Cooper*, 63 S.E.2d 717, 718 (1951), the district court explains:

An accord and satisfaction "is a method of discharging a contract or cause of action, whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the 'accord' being the agreement, and the 'satisfaction' its execution or performance."

*Id.*

Release agreement—which the district court's opinion refers to as the "Carve Out" provision—represents an intention to "preserve" Rafuse's financial responsibility under the "Obligation Provision" (in § 23 of the Pledge Agreement) from termination. Section 4 of the May 31, 2011 Accord and Satisfaction and General Release states:

> 4. The ACT I and Aurora Avionics, LLC hereby release and forever discharge Rafuse and his successors and assigns from and against any all claims, demands, [etc.] . . . whatsoever whether known or unknown, arising in law or in equity, of whatever nature (whether in contract, quasi-contract, tort, or otherwise) which any one or more of them had or, now has, or may in the future have, by reason of, arising out of, related to, or in connection with, any matter, right, cause or thing whatsoever, existing prior to or as of the Effective Date with respect to (a) the [Purchase Agreement]; and (b) the [Note].
>
> <u>This Release does not release Rafuse's responsibility and or liability for any causes of action, known or unknown, by third parties unrelated to the Purchase Agreement, including but not limited to any actions, known or unknown, that may have existed at the time of or prior to the execution of the Purchase Agreement.</u>[9]

The district court explained its decision regarding the purpose and effect of the second, underlined sentence of § 4—the so-called "Carve Out" provision—as follows:

> In the Court's judgment, the Carve Out [provision in § 4 of the May 31, 2011 Accord and Satisfaction and General Release] does not represent an intention to "preserve" . . . the Obligation Provision [in §23 of the Pledge Agreement] from termination for a few reasons. A release relinquishes or discharges a right of action; a carve out therefrom is, therefore,

---

[9] The underlining and line break have been added for the convenience of the reader.

not an affirmative act preserving or saving a contractual provision from the effects of a merger (or accord and satisfaction) provision. If the parties meant for the Obligation Provision to survive the Accord and Satisfaction, they could have been more explicit. For example, the Carve Out could have referenced the Obligation Provision by name or section number. More appropriately, the Merger Provision [in § 7 of the May 31, 2011 Accord and Satisfaction and General Release] could have included a carve out identifying the Obligation Provision. Or the Obligation Provision could have included a survival clause. . . . After all, the parties included just such a clause in the portion of the Pledge Agreement [§ 22], dedicated to attorneys' fees. . . . And here is the critical point. The parties failed to save the Obligation Provision [§ 23 of the Pledge Agreement] from termination and the Accord and Satisfaction does not express an intent to bind Rafuse to phantom obligations—obligations that would have arisen from the Obligation Provision if the Accord and Satisfaction had not terminated it.

[ACT I and Niggel] object further, arguing that the Carve Out must be referencing a pre-existing responsibility or liability, which could only be indemnity obligations under the Obligation Provision. . . . This argument sidesteps the aforementioned critical point. Moreover, the plain language of the Carve Out does not signal to the Court that it *must* be referencing obligations under the Obligation Provision. Which is to say, the Carve Out is not, on its face, superfluous or surplusage in view of a Merger Provision discharging contractual duties. (Nor is it ambiguous.) For all the Court knows, the Carve Out could be referring to non-contract claims, like common-law or statutory claims, that ACT I may have or have had against Rafuse in connection with those third-party claims the Carve Out references.[10]

---

[10] *See Rafuse*, 2022 WL 3030792, at *8–9.

Based on these determinations, the district court concluded that Rafuse bears no responsibility for the audit settlement amount that ACT I paid to the federal government in 2020, reasoning that ACT I had failed to allege a viable breach of contract or, alternatively, that Rafuse had established his accord and satisfaction defense. Thus, the district court granted Rafuse's motion for judgment on the pleadings insofar as it sought dismissal of ACT I's indemnity claim against Rafuse.

We acknowledge the logic of the district court's analysis. But we are not equally persuaded, on the instant record, that the relevant provisions of the contracts at issue here are sufficiently clear for the court to be able to ascertain the *parties'* true intentions—regarding Rafuse's alleged shared financial responsibility for contract actions resulting in company liability for *pre-closing* operating events—as a matter of law without the assistance of any extrinsic evidence.

A number of factors yield this conclusion. First, in this case, context matters. But neither the parties' contractual documents nor their pleadings provide important background information. Indeed, the obligation in dispute here is not one that the average person regularly, or even periodically, encounters and thus usually has some familiarity. Instead, it involves the parties' alleged allocation of financial responsibility amongst themselves (in 2008 and in 2011) for substantial sums that ACT I purportedly was obligated to reimburse the federal government in 2020—*nine* years after Rafuse had sold and been paid in full for his previously-owned 50% interest in ACT I, *six* years after the government audit was completed (in 2014) of ACT I's government contracts, and at least *twelve* years after ACT I provided unspecified services to the federal government (between 2005–2008). And, yet, the court is essentially left to speculate whether the instant parties regularly encountered and planned for such future contingencies in their ordinary business

operations *and* how those future contingencies likely would have been addressed in contractual documents effecting an owner-financed sale of 50 percent of the business.

Further complicating matters, the parties' contracts are not models of drafting precision.  To the contrary, the rationale for certain of the parties' drafting and organizational decisions is by no means obvious. To be sure, it is unclear why Rafuse's shared financial responsibility with ACT I (in their roles as "*Seller*" and "*Buyer*") for contractual liability from pre-closing operating events is addressed in a single paragraph (§ 23) included in the Pledge Agreement—which otherwise addresses the rights and responsibilities of the "*Secured Party*" (Rafuse) and the "*LLC/Pledgor*" (ACT I) vis à vis the security interest granted to Rafuse (as financier) and is designed to terminate upon the "*LLC/Pledgor*'s" satisfaction of its obligations under the Note and Purchase Agreement—rather than the Purchase Agreement or, like the Indemnity Agreement for Post Closing Events executed by ACT I and Niggel, in a separate document.

Nor is it apparent whether one party was charged with drafting responsibilities for the various contractual documents or the extent to which relevant contract language was negotiated. In any event, whereas many of the provisions appear fairly standard, if not boilerplate, others are much more "customized." And, both § 23 of the June 30, 2008 Pledge Agreement and the "Carve Out" provision in § 4 of the May 31, 2011 Accord and Satisfaction and General Release unquestionably fall into the latter category.

Unfortunately, despite their apparent customization, both provisions likewise lack sufficient specificity to ensure that a "stranger" to the parties' business dealings, contract discussions, etc., can fully and accurately comprehend the meaning and import that the parties intended. Even so, the customized language in those provisions seemingly was/is significant to the

parties and included for particular and important reasons. And, though worded differently, the two provisions are not necessarily inconsistent. Thus, though the district court's assessment of the parties' intentions ultimately may prove correct, we hesitate to conclude that the § 4 "Carve Out" provision does not, as a matter law, reflect the parties' intention to preserve Rafuse's shared financial obligation, set forth in § 23 of the Pledge Agreement, from termination.

Rather, given the lack of clarity in key provisions of the contract documents executed by the parties, consideration of relevant extrinsic evidence appears warranted to ensure the court ascertains and enforces the *parties*' agreement rather than "mak[ing] a contract for them." *Wilson*, 313 S.E.2d at 398; *Cascades N. Venture Ltd. P'ship.*, 457 S.E.2d at 373 (where terms of written contract are "ambiguous, vague, or indefinite" extrinsic evidence can be considered to "ascertain the intention of the parties and to establish the real contract between them"). But, because the district court previously did not consider ACT I's proffered evidence, we will not undertake that query in the first instance. Instead, that will be for the district court to do, on remand, in addition to determining the appropriate schedule and means by which such evidence shall be submitted and whether, prior thereto, additional discovery is warranted.

### B. Niggel's Indemnity Obligation to Rafuse

On cross-appeal, Rafuse challenges the district court's dismissal of his own indemnity claim, asserted pursuant to provision (iii) of the June 30, 2008 Indemnity Agreement for Post Closing Events, against Niggel. Specifically, Rafuse argues that the district court erred insofar as it construed the provision to apply *only* to loss or liability that he suffered in connection with ACT I's *post-closing* operating events—i.e., events that occurred subsequent to the June 30, 2008 "closing date" of Rafuse's sale of his ownership interest in ACT I—as opposed to expenses that Rafuse has incurred, in this litigation,

No. 22-51126

in contesting ACT I's claim seeking indemnity for liability arising from ACT I's *pre-closing* operating events.

The June 30, 2011 "Indemnity Agreement for Post Closing Events" provides:

> This Indemnity Agreement is executed and delivered by [ACT I] (collectively, the "Buyers") and Michael Niggel ("Niggel") as of June 30, 2008, pursuant to Section 6(iv) of . . . the [Purchase Agreement].
>
> Buyers and Niggel, jointly and severally, hereby indemnify and agree to hold Harold E. Rafuse (the "Seller") harmless from, against and in respect of (and shall on demand reimburse Seller for):
>
>> (i) any and all loss, liability or damage suffered or incurred by Seller by reason of any untrue representation, breach of warranty or nonfulfillment of any covenant by Buyers or Niggel contained in the Purchase Agreement or in any certificate, document or instrument delivered to Seller pursuant thereto or in connection therewith;
>>
>> (ii) any and all debts, liabilities, or obligations of Buyers or any of its subsidiaries or related companies, direct or indirect, fixed, contingent or otherwise, which are incurred or arise after June 30, 2008 (the "Effective Date"); and
>>
>> (iii) any and all successful actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses, including, without limitation, legal fees and expenses, incident to any of the foregoing or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing this indemnity.

No. 22-51126

Considering all of the parties' contracts together, as Virginia law instructs courts to do, including the various indemnity provisions therein, we agree with the district court's assessment of paragraph (iii).  That is, we agree that the only reasonable interpretation of the provision is that it provides Rafuse with indemnity from ACT I and Niggel *only* in the event that Rafuse suffers loss or liability in connection with operating events occurring *post-closing*.  Indemnity obligations to Rafuse relative to *pre-closing* operating events are addressed in § 23 of the Pledge Agreement. Thus, the district court correctly concluded that Niggel did not agree to be personally liable for the attorney's fees and expenses that Rafuse has incurred in this litigation regarding liability that ACT I incurred as a result of a contract action based on ACT I's *pre-closing* operating events.

V.

For the reasons stated, we affirm the district court's dismissal rulings except with respect to ACT I's indemnity counterclaim against Rafuse. Thus, the district court's  judgment of dismissal is VACATED IN PART (regarding ACT I's indemnity counterclaim against Rafuse) and AFFIRMED IN PART (regarding Rafuse's indemnity claim against Niggel). Accordingly, the action is REMANDED to the district court for further proceedings consistent with this decision regarding ACT I's indemnity counterclaim against Rafuse.

VACATED IN PART; AFFIRMED IN PART; REMANDED.

16